IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF CURRENTA GMBH & CO. OHG FOR AN ORDER TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. 1782 | **MISC. ACTION NO. 25-MC-27** |

**MEMORANDUM**

**Marston, J.** **September 30, 2026**

Currenta GMBH & Co. OHG ("Currenta") moves to compel FMC Corporation's compliance with its subpoena issued pursuant to 28 U.S.C. § 1782. (Doc. No. 13.) The subpoena demands eleven categories of documents and internal communications related to MP1 and MP1 Residue, chemicals produced by FMC's Danish subsidiary. The chemicals are alleged by Currenta to have played a role in a 2021 chemical explosion in Germany that killed seven people, injured thirty-one more, and caused an estimated 350 million Euros in damages, for which employees of FMC's subsidiary remain under criminal investigation. (Doc. No. 8 at 4, Doc. No. 23.) FMC opposes the motion to compel, arguing that it poses an undue burden on FMC due to the costs of compliance. (Doc. No. 20.) For the reasons below, the Court grants Currenta's motion.

## I. FACTUAL BACKGROUND

The Court restates the factual background as described in the Court's May 30, 2025 Memorandum granting Currenta's subpoena request. (Doc. No. 5.). On July 27, 2021, an explosion at Currenta's waste incineration plant in Leverkusen, Germany killed seven people, injured thirty-one more, and caused severe and extensive damage. (Doc. No. 1-5 at 44.1)

According to Currenta, FMC Denmark, FMC's subsidiary, caused this tragic accident because it misrepresented and downplayed the risks associated with the hazardous waste that it sent to Currenta to incinerate. (Doc. No. 1-3 at 12.) Based on FMC Denmark's misconduct, Currenta says its employees did not know about the risks of FMC Denmark's hazardous waste when they stored it, which ultimately led to the explosion. (Doc. No. 1-5 at 40, 43–44.)

FMC Denmark manufactures and distributes pesticides. (Doc. No. 1-5 at 14.) Its production of certain insecticides generates a byproduct known as "MP1 residue." (*Id.* at 18.) MP1 residue is a self-decomposable substance, meaning when a certain temperature is reached, a self-accelerating decomposition reaction takes place. (*Id.* at 18.) And when MP1 residue is stored in a closed container, this thermal decomposition reaction can result in an exponential increase in pressure and temperature and cause an explosion. (*Id.*)

FMC Denmark has known about the self-decomposing properties of MP1 residue for years. (*Id.* at 19.) In internal safety reports and workplace instructions, FMC Denmark flagged the extreme danger posed by a self-accelerating decomposition reaction of this substance. (*Id.*) Plus, there have been serious accidents involving MP1 residue, including in 2018 when a fire broke out in a pallet tank because MP1 residue had self-ignited. (*Id.* at 21–22.)

In 2018, FMC Denmark contracted with a Danish company to dispose of MP1 residue, but its amount of MP1 residue exceeded the company's disposal capacity. (*Id.* at 22.) So, FMC Denmark reached out to Abfall-Verwertungs-Gesellschaft mbH ("AVG"), a longtime business partner, about disposing of this hazardous waste. (*Id.* at 17.) AVG agreed to dispose of it but soon realized that it would not be able to. (*Id.* at 25.)

AVG then contacted third-party disposal companies, including Currenta, to determine whether they would be able to handle this disposal. (*Id.* at 27.) Currenta, who operates waste

disposal facilities in Germany, was interested in the contract, so AVG sent Currenta information about FMC Denmark's waste. (*Id.* at 14.) But, Currenta claims, AVG did not mention the waste's self-decomposing properties. (*Id.*)

In December 2020 and March 2021, Currenta and FMC Denmark entered into waste disposal agreements. (*Id.* at 28–29.) Pursuant to these agreements, FMC Denmark had to notify Danish and German authorities of the cross-border shipment of hazardous waste. (*Id*. at 30–31.) Currenta contends that FMC Denmark's notification misrepresented the nature of the waste because it indicated that it was not self-decomposable. (*Id.* at 37.) Currenta also alleges that FMC Denmark sent Currenta a safety data sheet, which significantly misrepresented the true risks of the waste. (*Id.* at 37–40.)

On July 9, 2021, the first delivery of FMC Denmark's waste arrived at Currenta's waste disposal site in Leverkusen. (*Id.* at 41.) The waste was immediately disposed of without any prior stage or transfer into a tank. (*Id.*) On July 26, 2021, the second delivery of FMC Denmark's waste arrived and was stored in a tank. (*Id.*) According to experts, a self-decomposition reaction of the waste was already in progress when the waste was transferred into the tank. (*Id.* at 42.) Because Currenta employees did not know the waste was self-decomposable, they did not take the proper safety measures for storing self-decomposable waste. (*Id.* at 43.) Instead, they stored the waste in a heated tank and throughout the day the temperature in the tank continued to increase. (*Id.*) Once the temperature hit 102°C, there was an exponential increase in temperature and pressure in the tank, which caused a physical explosion and then a chemical explosion. (*Id.*)

Tragically, seven people died and thirty-one more were injured from the explosion. (*Id.*)

at 44.) The explosion also created a smoke cloud that spread soot particles to nearby cities. *(Id.)* At the site of the explosion, there was substantial damage to neighboring waste disposal plants and other storage tanks. (*Id.*)

On July 26, 2024, Currenta filed a Statement of Claim (the German equivalent of a complaint) against FMC Denmark in the Cologne Regional Court of Germany. (*Id.* at 2.) In it, Currenta brought claims for breach of contract and malicious misconduct under German tort law. (*Id.* at 9–10.) To prevail on its malicious misconduct claim, Currenta must show that FMC Denmark "was aware that [its] actions could result in harmful consequences, which [it] accepted." (Doc. No. 1-3 at 11.) Currenta alleges that employees of FMC Denmark knowingly downplayed and concealed the extreme hazardous characteristics of its waste. (*Id.* at 12.) Because of FMC Denmark's alleged misconduct, Currenta employees were unaware of the possibility of thermal self-decomposition, which ultimately caused the explosion. (*Id.*)

The stakes of the German action are enormous. Currenta estimates that the explosion caused over 350 million Euros in damages, and it says an insurance consortium has paid out about 200 million Euros for the accident. (*Id.* at 12; Doc. No. 1-4 at 7–8.) In its initial Statement of Claim, Currenta sought, among other relief, over 146 million Euros in damages. (Doc. No. 1-5 at 4.) Currenta later updated its Statement of Claim in December 2024 to add AVG as a defendant and to increase its damages by more than 7 million Euros. (Doc. No. 1-4 at 7–8.)

On May 23, 2025, Currenta filed an application pursuant to 28 U.S.C. § 1782, seeking leave to serve a subpoena on FMC. (Doc. No. 1.) The subpoena demands eleven categories of documents and internal communications related to MP1 and MP1 Residue, which are chemicals produced by FMC's Danish subsidiary that are alleged by Currenta to have played a role in the explosion in Germany. (Doc. No. 8 at 4.) Currenta explains that German prosecutors seized

internal documents from FMC Denmark as part of a criminal investigation into the accident, which show that FMC Denmark discussed the disposal of its waste with FMC. (Doc. No. 1-4 at 7–8.)

On May 30, 2025, the Court granted Currenta's application (Doc. No. 5), and on June 9, 2025, Currenta served the subpoena on FMC. (Doc. No. 8 at 2). After meeting and conferring and agreeing on the scope of production, FMC has conducted a review and identified certain documents responsive to Currenta's subpoena. (*Id.* at 2.) On November 25, 2025, FMC filed an unopposed protective order for (1) documents and communications containing sensitive commercial, financial, and business information, including and not limited to internal FMC company policies, facility operating expenses, expenditures, budgets, plans, chemical production volume information, and pricing data, (2) technical schematics relating to the production and storage of certain commercial chemical products, and (3) internal personnel files and performance reviews. On December 8, 2025, the Court granted FMC's motion for entry of the protective order. (Doc. No. 9.)

For almost a year, the Court did not hear from the parties. Then, on September 3, 2026, Currenta filed the instant motion to compel FMC's compliance with the subpoena. The Court held a status conference on the same day. On September 11, 2026, FMC filed an Opposition (Doc. No. 20) and on September 14, 2026, Currenta filed a Reply (Doc. No. 23). As this matter is fully briefed, it is ripe for resolution.

## II. LEGAL STANDARD

The parties agree that FMC's document production in response to Currenta's subpoena is governed "in accordance with the Federal Rules of Civil Procedure." 28 U.S.C. § 1782(a) ("To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken,

and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."). Specifically, under Rule 45, a party issuing a subpoena "may move the court for the district where compliance is required for an order compelling production." Fed. R. Civ. P. 45 (d)(2)(B)(i). "As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things pursuant to a subpoena duces tecum." *Ogrod v. City of Phila.*, No. 21cv2499, 2023 WL 4494156, at *2 (E.D. Pa. July 12, 2023) (citing Fed. R. Civ. P. 34(c)) (cleaned up). "Rule 45 provides, however, that a nonparty may object to a subpoena and refuse production." *Id.* (citing Fed. R. Civ. P. 45(d)(2)(B)).

"When an objection is raised, '[t]he subpoenaing party must first show that its requests are relevant to its claims or defenses, within the meaning of Federal Rule of Civil Procedure 26(b)(1)[1].'" *Id.* (citations omitted). "Once that showing is made, 'the burden shifts to the subpoenaed nonparty who must show that disclosure of the information is protected under Rule 45(d)(3)(A) or (B).'" *Id.* (citation omitted). "In relevant part, Rule 45(d)(3)(A) provides that disclosure cannot be compelled where the subpoena (1) 'requires disclosure of privileged . . . matter, if no exception or waiver applies,' or (2) 'subjects a person to undue burden.'" *Id.* (citing Fed. R. Civ. P. 45(d)(3)(A)). If the subpoenaed nonparty claims the protections under Rule 45(d)(3)(B) or asserts that disclosure would subject it to undue burden under Rule 45(d)(3)(A), it must show that disclosure will cause it a "clearly defined and serious injury." *City of St. Petersburg v. Total Containment, Inc.,* No. 06cv20953, 2008 WL 1995298, at *2 (E.D. Pa. May 5, 2008). "This burden is particularly heavy. . . as contrasted to some more limited protection

[1] Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

such as a protective order." *Frank Brunckhorst Co. v. Ihm*, No. 12cv0217, 2012 WL 5250399, at *4 (E.D. Pa. Oct. 23, 2012).

If the subpoenaed nonparty demonstrates a "clearly defined and serious injury" for a claim of protection under Rule 45(d)(3)(B), the burden shifts back to the subpoenaing party to show "a substantial need for the testimony or material that cannot be otherwise met without undue hardship," Fed. R. Civ. P. 45(d)(3)(C)(i), and demonstrate "that the subpoenaed [nonparty] will be reasonably compensated," *id.* 45(d)(3)(C)(ii). If the subpoenaing party makes this showing of substantial need, the Court then weighs the interests in the disclosures. "This balancing test requires a Court to weigh (1) the relevance, (2) need, (3) and confidentiality of the requested materials, as well as (4) the harm that compliance would cause the subpoenaed nonparty." *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239 (E.D. Pa. 2014) (citing *Mannington Mills, Inc. v. Armstrong World Indus., Inc.* 206 F.R.D. 525, 529 (D. Del. 2002)).

## III. DISCUSSION

Currenta's Motion makes three arguments: (1) FMC failed to identify and search electronically storied information ("ESI") custodians and should be compelled to search three ESI custodians' files and the search term "RH"; (2) FMC failed to search known repositories and should be compelled to search key identified repositories likely to contain responsive documents; and (3) FMC failed to produce critical categories of responsive documents and should be compelled to do targeted search to remedy its noncompliance. (*See generally* Doc. No. 13.) In response, FMC argues that the motion to compel places an undue burden on FMC and is "unlikely to recover any additional relevant information and do[es] not justify any additional productions from FMC." (Doc. No. 20 at 7.) The Court disagrees with FMC and addresses each request separately below.

### A. ESI Custodians and Search Term RH

First, Currenta seeks to compel FMC to designate three additional records custodians (B.S., J.C., T.H.) and run a standalone search "RH" across the existing dataset. (Doc. No. 13-1 at 13.) Currenta argues that during initial negotiations over the scope of the subpoena, FMC represented that it had investigated the FMC employees who are most likely to have responsive communications and proposed six initial ESI custodians. (Doc. No. 13 at 10.) Once this production began, however, Currenta's review identified additional FMC employees materially involved in communications concerning the hazards of FMC Waste[2] and its disposal during the relevant period. (*Id.*) As such, Currenta requested FMC search the files of five additional custodians. FMC responded that four of the five of these custodians were no longer employees, and their files were no longer available. (*Id.*) Now, Currenta seeks to compel the designation of three additional custodians (B.S., J.C., T.H.) who they assert possess unique, non-duplicative information.[3] (*Id.*) And Currenta seeks an order to compel FMC to run the standalone search term "RH" across the database. Currenta argues that "despite FMC Employee [RH's] involvement on an 'MP-1 Disposal Team' that 'regularly convened to address precisely the disposal challenges at issue'. . . FMC produced fewer than 70 documents total involving [RH], limited its search to three compound search strings, and refused to run [RH] as a standalone term

---

[2] Currenta defines FMC Waste as hazardous waste produced by FMC Denmark that thermally self-decomposed in a storage tank of the hazardous waste incineration plant operated by Currenta that led to 2021 explosion. (Doc. No. 13-1 at 5.)

[3] With regard to B.S and J.C, Currenta asserts that documents seized from FMC Denmark by the German prosecutor show that on December 9, 2020, seven months before the explosion, an FMC Denmark employee communicated with FMC employees B.S and J.C. and about a Safety Data Sheet for the FMC Waste, describing its composition as "complicated" and noting a sample "had been sent out for testing for hazardous properties. (Doc. No. 13 at 11.) Currenta asserts that "FMC inexplicably never disclosed them as custodians likely to have responsive documents." (Doc. No. 13-1 at 12.) Currenta also seeks the designation of T.H. as a record custodian, who they argue was materially involved in critical communications concerning the hazards of the FMC Waste, yet her custodial file has never been searched. (Doc. No. 13-1 at 12.)

across the existing dataset." (Doc. No. 13-1 at 12.)

FMC opposes these requests for a myriad of reasons: Currenta has not demonstrated a valid basis for this demand, it is unduly burdensome because some of these documents are from 2016, and the standalone search, RH, is overbroad. (*See* Doc. No. 20 at 10–11.) The Court is not persuaded by FMC's arguments and will grant Currenta's requests.

Here, Currenta has shown that the request is relevant to the subpoena because these identified custodians were likely involved in "critical communications" concerning the hazards of the FMC Waste. (Doc. No. 13-1 at 10, 12.) While FMC labels the searches an "undue burden" on their time and finances, FMC fails to *concretely* identify how running these additional searches will cause FMC a "clearly defined and serious injury" or what the cost of compliance would be. (Doc. No. 20 at 5.) *See Gabe Staino Motors, Inc. v. Volkswagen of Am., Inc.*, No. No. 99cv5034, 2003 WL 25666135, at *3 (E.D. Pa. Feb. 28, 2003) (citing *Association of Am. Physicians & Surgeons v. Clinton,* 837 F. Supp. 454, 458 n. 2 (D.D.C.1993) ("Merely asserting that a party will suffer an undue burden without "specific estimates of staff hours needed to comply" will be "categorically rejected."); *Cleckner v. 3M Company*, No. 22cv2055, 2024 WL 7013975, at *4 (M.D. Pa. 2024) ("A party seeking to quash a subpoena on undue burden grounds bears a heavy burden" and must show "that subpoena is unreasonable and oppressive.") (internal citation omitted). Here, Currenta has not provided estimates of costs or described why compliance is "oppressive" in proportion to the beneficial information that may be gained from these additional searches. *Id*. And the Court agrees with Currenta that FMC has "better access to and knowledge of FMC's own custodians most likely to have relevant information than Currenta" (Doc. No. 23 at 7) so the Court rejects the implication by FMC that Currenta should have previously identified these custodians.

**B. Search Known Repositories**

Second, Currenta asserts that while FMC has collected custodial files (email and personal OneDrive folders) for six custodians, it has "refused to search [additional] known shared repositories for responsive documents" including a SharePoint site or SAP location identified through communications between B.S., J.C., and T.H. (Doc. No. 13-1 at 15.) In response, FMC asserts that it would cost "at least $15,000 just to upload the raw data from these repositories to their servers" and that amount "could quickly multiply because of the costs of running keyword search and reviewing those hits for responsiveness." (Doc. No. 20 at 12– 3.) Again, the Court finds that this request is plainly relevant to the underlying subpoena given that the SharePoint or SAP may contain sensitive communications between FMC employees about FMC Waste processes. While this time, FMC *does* provide the Court with a more tangible estimate of the costs estimate to comply with this request, the Court finds that this cost estimate is not "unduly burdensome." *See* Fed. R. Civ. P. 45(d)(3)(A). Instead, we find that it is proportionate to the magnitude of the underlying incident, where seven people died, thirty-one were injured, and estimates determined that the explosion caused over 350 million Euros in damages. (Doc. No. 1-4 at 7–8; Doc. No. 23 at 5); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 18cv1215, 2019 WL 117555, at *2 (3d Cir. Jan. 7, 2019) (citing Fed. R. Civ. P. 26(b)(1). Compliance with this request is a drop in the bucket of the broader liability and damages at stake in the underlying action against FMC's subsidiary, FMC Denmark. As such, the Court will grant this request.

**C. Targeted Searches**

Third, Currenta asserts that "important categories of responsive documents are missing entirely from FMC's productions" including communications or documents regarding waste classification, and other events relating to the "2018 [RL] Incident" which it asserts are squarely

within Requests 7 and 8 of the subpoena.[4] (Doc. No. 13-1 at 16–19.) As such, Currenta moves for the Court to order FMC to perform supplemental searches of the custodial files of B.C., J.A., and C.S., if available, or alternate custodians, "using the targeted terms in Appendix A for the time period January 1, 2016, to December 31, 2021, to identify documents regarding the 2018 [RL] Incident responsive to the Subpoena, and to produce or identify with specificity all responsive documents." (Doc. No. 13-1 at 18.) In response, FMC argues that if it were compelled to run these additional searches, "it would require entirely new collections from new custodians going back to 2016, [and] it would require FMC to perform yet another document review." (Doc. No. 20 at 15.) Again, the Court finds that this information sought from Currenta is directly relevant to the subpoena, as the RL Incident predates the 2021 explosion and Currenta's motion suggests that FMC personnel had direct knowledge of and were briefed on the implications of the Incident. And here, FMC has "once against failed to satisfy its burden of establishing an undue burden with the requisite specificity." *Gabe Staino Motors, Inc.*, 2003 WL 25666135, at *4; *Mid-Atlantic Steel, LLC., v. CCP Development, LLC*, No. 24cv0071, 2025 WL 4676057, at *1 (E.D. Pa. 2025) ("Without cost or effort estimates, or some other showing of harm, [Defendant's] generalized claim of undue burden doesn't meet the standard for quashing discovery.") As such, the Court will grant Currenta's request.[5]

## IV. CONCLUSION

As FMC concedes, "it is well settled that decisions on matters pertaining to subpoena

[4] On June 2, 2018, FMC Waste underwent an uncontrolled thermal decomposition in a vessel at FMC's [RL] facilitating, producing a large vapor cloud and forcing an employee to flee for fear of an explosion. (Doc. No. 13-1 at 17.) Seized documents show FMC's senior leadership attending a presentation on this incident and suggest that they traveled to Denmark to discuss the incident. (*Id.* at 18.)

[5] The Court will, however, narrow FMC's burden to searches related to the "2018 [RL] Incident time period to Jan 2018 to Dec. 2021" as Currenta offers in its Reply. (Doc. No. 23 at 8.)

compliance rest in the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of that discretion." *Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of Rhode Island*, 2016 WL 8716426, at *3 (E.D. Pa. Nov. 4, 2016) (citation omitted). Here, we find that Currenta is not "turning over every possible stone" as FMC contends (see Doc. No. 20 at 10), but rather, seeking to turn over the stones that have profound relevance and proportionality to the magnitude of their litigation. For these reasons, Currenta's motion to compel is granted.[6] An appropriate order follows.

[6] The Court also denies FMC request that "[t]he court should exercise its discretion and order cost-shifting here [for compliance with the motion to compel requests]." (Doc. No. 20 at 10.)